UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| DONALD F. GREENE and | ) | |
| NICOLE F. GREENE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:21-CV-256-TAV-JEM |
| | ) | |
| LEDVANCE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendant's Motion to Exclude Testimony of Plaintiff's Expert Witness, Thomas Kelly ("Motion to Exclude") [Doc. 41] and Defendant's Motion to Strike the Declaration of Thomas J. Kelly, P.E. ("Motion to Strike") [Doc. 34]. Plaintiffs responded in opposition to both motions [Docs. 50, 39], respectively, and they filed a supplemental brief in opposition to the Motion to Exclude [Doc. 54]. Defendant filed replies in support of its motions [Docs. 51, 46], respectively, and it responded to Plaintiffs' supplemental brief to its Motion to Exclude [Doc. 55]. The parties appeared before the undersigned on November 16, 2023, for a motion hearing. Attorneys Paul Wehmeier and R. Kim Burnette appeared on behalf of Plaintiffs. Attorneys Andrew Chamberlin, James Weiss, and Brigid Carpenter appeared on behalf of Defendant. Following the hearing, the Defendant filed a supplemental brief [Doc. 58]. For the reasons explained below, the Court **GRANTS** Defendant's Motion to Exclude [**Doc. 41**] and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Strike [**Doc. 34**].

1

## I.    BACKGROUND

"On June 11, 2020, while working as a site manager for Waste Connections . . . Plaintiff Donald Greene was in the process of changing a fluorescent lightbulb located on a side wall within the confines of [a] garage" [Doc. 26 ¶ 4]. According to the allegations in the First Amended Complaint, while Plaintiff Donald Greene ("Plaintiff Greene") was removing the light bulb, it "suddenly, and without warning, violently exploded" [*Id*.]. As a result of the incident, Plaintiff Greene "sustained severe injuries, primarily to his left arm" [*Id*. ¶ 5].

Plaintiffs claim that Defendant is the designer, manufacturer, seller, and distributor of the subject florescent light bulb, and they have brought suit alleging violations of the Tennessee Product Liability Act, Tenn. Code Ann. § 29-28-101, *et seq*. [*Id*. ¶ 6]. Asserting that a fluorescent light bulb does not "violently explode" in the normal course of handling, Plaintiffs allege that Defendant is also liable pursuant to the common law doctrine of *res ipsa* loquitor [*Id*. ¶ 7].

On May 26, 2023, Plaintiffs disclosed Thomas Kelly ("Kelly") as their expert in this action [*See* Doc. 34-1]. Kelly is a licensed electrical engineer [*Id*. at 19]. Since 2017, Kelly has been employed with the Warrant Group, Inc., as a senior consulting engineer, describing his job duties as:

> Performing specialized consulting related to property damage and injuries involving electrical equipment, devices, wiring, connections, and other related electrical hardware, electrical fires and failures, arc flashes, electrocutions, shocks[,] and other electrical injuries to people, electrical control system engineering, [and] electrical design safety.

[*Id*.]. He also worked as a facilities manager, where he:

> Managed multi-site manufacturing and office facilities. Evaluated facility conditions for building envelope performance, energy consumption and lighting performance and compliance. Determined capital improvement projects and analyzed energy usage. Managed critical data center infrastructure including fire

2

suppression systems and emergency power systems for multiple site locations.

[*Id*. at 20].

As part of his investigation, Kelly (1) "inspected clothing items from the day of the incident that [Plaintiff] Greene was wearing[,]" (2) "inspected lamps recovered from adjacent fixtures at the subject facility[,]" and (3) "met with [Plaintiff] Greene and inspected, documented, photographed the subject light fixture and facility" [*Id*. at 3]. He also reviewed Plaintiff Greene's deposition transcript, the emergency medical services report dated June 11, 2020, the police report dated June 11, 2020, an invoice from Lloyd's Electrical Service dated December 31, 2013, the Safety Data Sheets ("SDS") for Sylvania fluorescent light bulbs, and photographs taken from the scene of the incident [*Id*. at 3–4]. Kelly analyzes:

> The power to the lamp was turned off via the circuit breaker panel before the process of changing the lamp. This step disconnected the energy source for the light fixture. The incident was not caused by an electrical failure in the building's electrical system.
>
> The subject light fixture contained a single electronic ballast. No battery backup or other stored energy was located in the light fixture. Power to the fixture had been removed via the opening of the related circuit breaker before the process began. [Plaintiff] Greene did not have any observable burn marks on his hands that would indicate contact with an energized source. The subject light fixture was placed back in service after lamps were replaced post incident. The incident was not caused by an electrical failure in the light fixture.
>
> Fluorescent lamps are fabricated with thin glass tubing. A phosphorus coating is applied to the inside of the glass tube. Glass end caps are then fused to the glass at high heat to mount the tungsten filaments within the tube ends. Mercury vapor is inserted into the tube during the final sealing process. A metal cap with the insulator and connecting pin subassembly is crimped to the glass assembly. Each of these steps can add stress to the thin glass components of the lamp assembly. A defect in one of the components can be influenced by these stresses and remain like a primed trigger.

3

> The ladder was placed in a stable position against the wall adjacent to the subject fixture. Based on the recreation of the removal process, the incident was not caused by improper handling of the subject lamp. The multiple pieces of scattered tissue observed on the floor indicate an explosive-type force that caused the damage to [Plaintiff] Greene's arm muscle.

[*Id*. at 6–7]. Based on this analysis, Kelly concludes that "to a reasonable degree of engineering certainty, the failure of the subject lamp was caused by a defect in the fluorescent lamp assembly" [*Id*. at 7].

On the same day that Plaintiffs disclosed Kelly as their expert, May 26, 2023, Defendant moved for summary judgment [Doc. 27]. In support of its motion, Defendant filed declarations of its experts, David W. Powell ("Powell"), a mechanical engineer [Doc. 27-2], and Erick H. Knox ("Dr. Knox"), Ph.D., P.E., a biomedical engineer [Doc. 27-6], and it also filed the declaration of its corporative representative, Danielle Sohl ("Sohl") [Doc. 27-1].

On July 5, 2023, in response to Defendant's motion for summary judgment, Plaintiffs filed the Declaration of Thomas J. Kelly, P.E. ("Kelly's Declaration") [Doc. 34-3], which is dated July 3, 2023. Kelly's Declaration states, in part:

> 5. The physical demonstration as presented by [Plaintiff] Greene and subsequent description of how he removed the lamp corrected his initial verbal description of the process as recorded in my field notes, where he had the direction of movement to remove the lamp reversed. The direction of movement does not change my opinions expressed about the failure of the lamp.

> 6. The fly section of the ladder used was part of a Type IAA assembly that was rated for a working load of 375 pounds. The fly section would have to support the same weight as the lower section for the entire assembly to be able to support the rated 375 pounds.

> 7. The subject bay of the Waste Connections leased space was used for vehicle and equipment maintenance and repairs. As such[,] various tools and vehicle parts have been stored and moved within this space. Marks on the walls are as likely to be from parts or tools

4

leaned against the walls as from the ladder striking the wall close to the floor.

[Doc. 34-3 ¶¶ 5–7].

Kelly also addresses Defendant's alternate hypothesis that the ladder was positioned under the subject light fixture at the time of the incident and explains his reasons for discounting that hypothesis, including that the "missing portion of the broken cover plate" on an electrical outlet cover does "not match the size and orientation of the plastic piece on the floor" [*Id.* ¶ 8(c)]. Kelly further states:

> 10. Due to the concerns of bloodborne pathogens and the ensuing pandemic at the time of the incident[,] the debris was disposed of as part of the cleanup process and was therefore not available for further evaluation leaving the description of events by [Plaintiff] Greene, the only witness at the scene, and the photographs taken after the incident as the primary evidence to consider.

> 11. The National Fire Protection Association 921: Guide for the Fire and Explosion Investigations as addressed during my deposition is a general guideline for the investigation of structure and vehicle fire events and explosions. While the lay description of the event was termed an explosion, the circumstances of the lamp failure do not fit the definition within the 921 Standard. I used the available information of the witness statement and photographic evidence in a manner consistent with consideration of the investigative process outlined in NFPA 921.

[*Id.* ¶¶ 10–11]. Kelly also opines on the SDS for the subject light bulb:

> Given the lack of warnings contained within the SDS and on the subject lamp, [Plaintiff] Greene would not have been made aware of the severity of the hazard associated with the failed subject lamp, i.e., in the manner in which the subject lamp imploded and forcibly ejected glass fragments and components resulting in [Plaintiff] Greene's injury[.] . . . Given the lack of warnings in the SDS and the absence of warnings on the lamp, [Defendant] failed to provide adequate warnings for this product.

[*Id.* ¶ 14].

5

## II.    SUMMARY OF TESTIMONY

The Court held a *Daubert* hearing on November 16, 2023, wherein Kelly testified. On direct examination, Kelly testified to his professional experience outlined in his curriculum vitae [*see* Doc. 41-7], and noted that he had been in facilities management for approximately fifteen years. In this role, he received formal training on ladders, fire extinguishers, and other equipment. Kelly testified that in his current role, he performs fire, shock, and electrical investigations.

Kelly testified that the incident was caused by the fluorescent light bulb imploding and ejecting glass material. He explained that from a definition standpoint, according to the NFPA, "explosion" involves a fuel, gas, or a chemical. But here the light bulb imploded, which can be perceived by a layperson as an explosion. In order to arrive at his conclusions in this case, Kelly saw how the building was used and looked at the electrical circuit and the wiring for the light fixture. He disassembled the light fixture and looked at the internal wiring, components, sockets, and tombstones. Kelly confirmed that the fixture was functional and that there were no defects in the dockets or the valance. He also met with Plaintiff Greene, who discussed his recollection of what happened so that Kelly could understand from his perspective what he saw. Given that the incident was not an explosion as defined by NFPA 921, Kelly assessed the energy sources, reviewed the physical dimensions, arrived at a hypothesis, and evaluated that hypothesis against the physical conditions. And using his knowledge, experience, and education, he arrived at a conclusion. He concluded that the incident was not caused by an electrical failure given that there was no defect in the bay. He evaluated and ruled out potential causes, and he relied on Plaintiff Greene's testimony and physical demonstration to render his opinion that there was a manufacturing defect in the light bulb.

Kelly testified that he has experience with the light bulb at issue, noting that during his tenure as a facilities manager, he used that type of light bulb. When he was a tenant manager at a university, he purchased and stocked that type of light bulb. In addition, he has seen the process in which they were made by watching a documentary before the litigation. From that documentary, he viewed the process of how glass is distributed, how phosphate is coated and vacuumed, and how the glass is sealed after the argon gas is put in the tube. With respect to his opinion that the incident was not caused by improper handling of the subject light bulb, Kelly based this conclusion on Plaintiff Greene's demonstration of how he changed the lamp and added that there was no trauma to Plaintiff Greene's hands.

Kelly testified that his opinions in the Declaration are responsive to Defendant's experts' declarations that were filed in support of its motion for summary judgment. As it pertains to paragraph 6 of his Declaration, Kelly explained that a ladder's label contains the weight limit and that the fly section would have to support the same weight as the lower section for the entire assembly. Kelly bases this opinion from his experience of using ladders and from his training. Similarly, Kelly derived the opinions contained in paragraph 8 of his Declaration from his review of photographs and his professional and practical experience. Kelly stated that there were no scuff marks on the floor from the black plastic caps on the bottom of the ladder's fly section, which indicates that the ladder did not slide down the wall. Otherwise, according to Kelly, there would have been a transfer of material from the black plastic caps to the floor. He explained that he owns a ladder with blue end caps that have created scuff marks.

Kelly also opined in his Declaration that "[d]ue to concerns of bloodborne pathogens and the ensuing pandemic at the time of the incident the debris was disposed of as part of the cleanup process" [Doc. 41-8 ¶ 10]. Kelly testified that the injury involved bleeding and that he has had

multiple blood borne pathogens training sessions, including on how to respond, and he was on the medical emergency response team with one of his employers.

Referencing his opinions in paragraph 13, Kelly testified he has used SDSs for many years in his career, explaining that a user of a product is required to know about its hazards. He also relies on SDSs in his investigations so that he knows what he is able to do for testing purposes. He reached his conclusion in paragraph 14 of his Declaration by relying on his experience in various roles, including managing facilities and in product design, stating that he looks at components in other products and relies on the SDSs for those products.

On cross examination, Kelly acknowledged that he is not a ladder expert, nor an accident reconstructionist. He noted, however, that he has experience with using ladders and has attended training. Kelly testified that his hypothesis is that the light bulb failed spontaneously without any mishandling by Plaintiff Greene, the light bulb contained a defect, and that the defect was caused by residual stress left behind in the manufacturing process. He did not investigate the manufacturing process or the quality control of the type of light bulb at issue, separate from reading Sohl's deposition. In addition, Kelly acknowledged that he has never (1) designed a fluorescent light bulb, (2) manufactured a fluorescent light bulb, (3) published any literature about the proper manufacturing of a florescent light bulb, (4) published any opinions about soda lime glass (the glass used in the subject light bulb), or (5) published any opinions about residual stress. He also testified that he does not have any professional experience manufacturing soda lime glass or detecting residual stress on soda lime. He attempted to find literature on whether residual stress can cause a light bulb to shatter spontaneously but said he was unsuccessful.

Kelly testified that he had three exemplar fluorescent light bulbs, but he did not find any signs of defect based on his visual inspection. He did not dissemble the exemplars to determine

8

whether there was a defect in the manufacturing process, he did not submit them to a computed tomography ("CT") scan or take a magnetic resonance image, nor did he conduct internal pressure testing. He knows that argon gas is used and that mercury vapor is added as part of the manufacturing process, but he did not determine or test whether that was properly done in his three exemplars, and he did not perform any residual stress testing on the three exemplars. Kelly explained that stresses in the subject light bulb may not have been in the exemplars that were part of a batch. Based on his inspection of the exemplar, there was no visible, discernable damage or design defect from the exterior. He acknowledged that he did no testing in support of his hypothesis but noted that the subject light bulb was not available to inspect. Kelly stated that he relied on Plaintiff Greene's deposition and his account of what occurred to support his hypothesis and considered other causes but ruled them out.

Defense counsel asked Kelly about Figure 4 in his expert report [*See* Doc. 41-2 p. 11]. Based on Plaintiff Greene's account, Kelly believes the ladder slid down the wall after Plaintiff Greene dismounted following the incident. There is a dark line on the wall, which Kelly states could be from the ladder. But with respect to the mark, he did not take a sample to determine if it was the same type of plastic on the ladder because he did not have the ladder. He does not know if the ladder slipped instantaneously or if Plaintiff Greene shifted the ladder while he was still on it. According to Kelly, if the ladder slid down the wall, there would be a mark on the conduit. In a photograph [Exhibit 1], Kelly identified marks along the conduit and damage to the electrical outlet. Kelly did not reference these marks in his initial disclosure and did not explain why the marks should be disregarded. Kelly opined that tools could have made the marks on the wall.

Kelly testified that the fixture at issue was approximately nine feet off the floor, and the ladder extended to approximately twenty feet. Kelly did not put the ladder under the fixture to

determine if it was safe to place underneath, and he did not test Plaintiff Green's account of where he placed the ladder. Based on his experience, the safe angle of a ladder is 75 degrees with proper feet, and if the angle is too large, it can slip. The ladder here did not have proper adjustable feet, but instead, had rounded plastic feet.

With respect to his Declaration, Kelly testified that he issued an opinion regarding the lack of warnings but neither Powell, nor Dr. Knox, offered any opinions on warnings. He acknowledged that this opinion was not in rebuttal to Defendant's experts' opinions and that it was a new opinion. He further testified that he is not an expert in developing product warnings and that he has not researched warnings and industry standards. In addition, he is not a human factors expert. Citing to paragraph 8 of his Declaration, he made four observations with respect to the position of the ladder, which he believes are consistent with Plaintiff Greene's account. Kelly testified that he visited the scene thirty (30) months after the incident and that the floor had been cleaned; however, he reviewed photographs of the incident.

On re-direct examination, Kelly testified that something occurred to the light bulb to make it go through implosion and ejection of material. Kelly stated that there are several factors that could have affected the glass, including a temperature change in the room or temperature change due to Plaintiff Greene's hands. But Kelly does not have a way to test the subject light bulb because it is not available. Kelly testified that according to Sohl's deposition, there are various ways a light bulb can break. Kelly stated that he also did not have testing records because the plant where the light bulbs were manufactured closed, and the records were destroyed. With respect to the marks on the wall, Kelly acknowledged that he cannot determine what made the marks.

10

Kelly further testified that his failure to warn opinion in his Declaration was in response to Powell describing an implosion and that the SDS does not mention implosion and the forcible injection of the glass. He said he is not offering this opinion as an engineer but instead as a facilities manager.

## III.    SUMMARY OF ARGUMENTS

Defendant moves to exclude Kelly's testimony pursuant to Rule 702 of the Federal Rules of Civil Procedure and *Daubert v. Merrell Dow Pharmas, Inc.*, 509 U.S. 579, 589 (1993) [Doc. 41]. According to Defendant, Kelly "testified that there is no evidence of any defect in the subject fluorescent lamp[,]" and this concession "justifies excluding his testimony" as irrelevant [Doc. 42 p. 1]. In addition, Defendant claims that Kelly's opinions are not based on sufficient facts or data and that his methodology is unreliable [*Id*. at 8–16]. Similarly, with respect to the opinions expressed in the Declaration, Defendant moves to strike them, claiming that they too are inadmissible under *Daubert* and Rule 702 [Doc. 35 p. 7]. But to the extent the Court does not exclude them under *Daubert* or Rule 702, Defendant argues that they are untimely under the Scheduling Order and should be excluded under Rule 37 of the Federal Rules of Civil Procedure [*Id*. at 3–8]. Defendant also seeks reasonable expenses, including its attorneys' fees incurred in filing its Motion to Strike [Doc. 34 p. 2]

Plaintiffs state that "Kelly is qualified to render his opinions and his opinions will assist the trier of fact" [Doc. 50 p. 10 (emphasis omitted)]. Noting that the scene was cleaned before any expert could visit, Plaintiffs contend that Kelly's "initial opinions were offered after thoroughly reviewing the available evidence" [*Id*. at 6]. Plaintiffs claim that Kelly utilized the process of elimination to determine that the fluorescent light bulb contained a defect, and Defendant's expert acknowledged that this process is appropriate [*Id*. at 8]. According to

11

Plaintiffs, "there is ample proof in the record to establish the expertise and experience of Mr. Kelly to render and testify to all of his proffered/and anticipated professional opinions as set forth in his expert disclosure and rebuttal disclosure" [*Id.* at 12]. Plaintiffs filed a supplemental brief, arguing that Sohl's deposition testimony "completely undercuts the theory espoused by . . . Powell" [Doc. 54 p. 4]. With respect to the opinions expressed in his Declaration, Plaintiffs assert that they are proper rebuttal opinions, which are timely under the Scheduling Order [Doc. 39 pp. 6–8]. And here, Plaintiffs assert, Defendant cannot claim any prejudice as a result of Kelly's Declaration and that they "are ready and willing to allow the defense to take a supplemental deposition of Mr. Kelly should [it] request to do so" [*Id.* at 8].

Defendant replies that (1) "Plaintiffs' response fails to establish that Mr. Kelly has identified a product defect[,]" (2) "Plaintiffs' response fails to show that Mr. Kelly tested his hypothesis as required by NFPA 921 and the scientific method[,]" and (3) "Mr. Kelly's new opinion that [Defendant] should have warned about the risk of glass dispersion if a fluorescent lamp shatters is (a) an untimely new theory of the case, (b) not a rebuttal opinion, and (c) beyond the scope of Mr. Kelly's expertise" [Doc. 51 p. 3]. Defendant asserts that Kelly's newly disclosed opinion about "pathogens" is also untimely and inadmissible [*Id.* at 10–11] Plaintiffs' supplemental brief, Defendant argues, does not comply with the Local Rules, but regardless, it mischaracterizes Sohl's testimony [Doc. 55 p. 1].

With respect Kelly's Declaration, Defendant states, that it "attempt[s] to change [his] prior report and testimony" [Doc. 46 p. 3]. By filing Kelly's Declaration, Defendant argues that Plaintiffs are attempting to "unilaterally extend their time to issue expert opinions" [*Id.* at 8 (emphasis omitted)]. And a second deposition of Kelly, Defendant asserts, will not remedy the prejudice resulting from an untimely disclosure.

## IV.    MOTION TO EXCLUDE

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[1] The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any

---

[1]    Rule 702 was amended on December 1, 2023. The parties dispute whether the Court should apply the current version of Rule 702 or the prior version in deciding the issues related to Kelly. The Court utilizes the current version of Rule 702 because it governs "insofar as just and practicable, all proceedings then pending." Prop. Ams. to the Fed. R. Evid., 344 F.R.D. 850, 851. *See also United States v. Candelaria*, No. 22-CR-767 KWR, 2023 WL 8185932, at *1 n.1 (D.N.M. Nov. 27, 2023) (applying amendment before the effective date of the amendment because the trial was scheduled to occur after the effective date); *Andrews v. Brethern Mut. Ins. Co.*, No. 4:19-cv-01107, 2023 WL 660710, at *6 (M.D. Pa. Oct. 12, 2023) (taking "heed of the forthcoming changes so as to avoid the misapplication of Rule 702 identified by the Advisory Committee"). But the result would be the same regardless of whether the Court applied the current or prior version of Rule 702. The changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512JLTCDB, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023). Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to

13

and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

The factors relevant in evaluating the reliability of the testimony include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94), *aff'd*, 89 F. App'x 927 (6th Cir. 2003). The inquiry is "a flexible one," and these factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138–39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70–71 (quoting *Daubert*, 509 U.S. at 593–94). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

---

be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142). "This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

After considering the parties' arguments and the evidence in this case, the Court finds that Kelly's opinion that the incident was not caused by improper handling is unreliable and therefore inadmissible. The Court finds that Kelly is not qualified, and is his method is not reliable, to render his opinion that the incident was caused by a defect in the fluorescent light bulb assembly. The Court further finds that Kelly is not qualified to render his opinion on warnings and that his opinion regarding the cleanup process is speculative.

A.    **Kelly's Opinion Plaintiff Greene Did Not Improperly Handle the Light Bulb**

To the extent Kelly is qualified to render the opinion that Plaintiff Greene did not improperly handle the light bulb, the Court finds that it is based on insufficient facts and data.[2] To arrive at his conclusion that Plaintiff Greene did not improperly handle the light bulb, Plaintiff

---

[2]    Kelly's curriculum vitae states that he has experience with "[i]ndustrial accident reconstruction" [Doc. 41-7 p. 3]. But at the *Daubert* hearing, he testified that he is not an expert in accident reconstruction and he did not provide any testimony regarding his experience with "[i]ndustrial accident reconstruction" [*Id.*]. *See Stevens Transp., Inc. v. Glob. Transp., LLC*, No. 6:15-CV-552-MHS-JDL, 2016 WL 9244669, at *2 (E.D. Tex. May 24, 2016) ("Experts in accident reconstruction typically have a degree in engineering, as well as certification in accident reconstruction, and experience conducting studies and experiments, taking measurements, and collecting data from accident scenes[.]" (citation omitted)).

15

Greene reenacted for Kelly how he purportedly removed the light bulb on the day of the incident [Doc. 41-2 p. 8; *see also* Doc. 41-3 pp. 25–26]. During his deposition, Kelly acknowledged that he did not test Plaintiff Greene's statement about where the ladder was located at the time of the incident [Doc. 41-3 p. 22], "even though [Plaintiff] Greene's memory of where he placed the ladder was not congruent with the location of the ladder in photographs of the scene after the accident" [Doc. 42 p. 9 (citing Doc. 41-3 pp. 35–36, 37)]. Instead, Kelly speculates that the "ladder moved to the left when it came off the wall" [Doc. 41-3 p. 36–37]. In addition, he and Plaintiff Greene used a different type of ladder for the reenactment, Kelly did not attempt to verify whether the rung spacing on the ladders was the same, and Kelly's ladder was in serviceable condition [*Id*. at 22–23]. The reenactment also did not take into account that Plaintiff Greene attempted to change the bulb using the top fly section of the extension ladder [*Id*. at 28–29]. Further, Kelly did not attempt to determine whether there was a nonslip surface on the bottom of the fly section [Doc. 41-4 p. 30].

In his Declaration, Kelly states that Plaintiff Greene's demonstration and description of the incident "correct his initial verbal description of the process as recorded in [his] field notes, where he had the direction of movement to remove the lamp reversed" [Doc. 41-8 ¶ 5]. Kelly states that, regardless, "[t]he direction of movement does not change my opinions expressed about the failure of the lamp" [*Id*.]. But Kelly's statement "does not make any difference because the reenactment of the accident was not representative of the accident itself[]" [Doc. 42 p. 17]. And in response to defense counsel's question about whether the recreation of [Plaintiff] Greene's memory is a scientifically valid test or experiment, Kelly testified that "[i]n all the parameters, no" [Kelly's Deposition Transcript p. 89].[3]

---

[3]     Defendant did not file this page in CM/ECF; however, at the *Daubert* hearing, Defendant submitted the entire transcript of Kelly's deposition without objection from Plaintiffs.

Similarly, Kelly claims that the marks on the wall in the location of where the ladder fell could have been caused by tools, there were no scuff marks on the floor under the ladder, the electrical conduct is not misaligned, and the debris in the floor does not match the missing portion of the broken cover plate [Doc. 41-8 ¶ 8 (a)–(c)]. But he took no steps to investigate these opinions, rendering them speculative and unreliable.[4] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

The Court finds that Kelly's opinion that the incident was not caused by improper handling is not based on sufficient facts and data.

---

[4] Relatedly, Kelly opines that "[t]he fly section would have to support the same weight at the lower section of the entire assembly to be able to support the rated 375 pounds" [Doc. 41-8 ¶ 6]. Kelly acknowledged that he is not a ladder expert, although he detailed his extensive use of ladders during the *Daubert* hearing. Nevertheless, Plaintiffs have not established this opinion is supported by sufficient facts. Instead, at the *Daubert* hearing, Kelly concluded that based on his experience and training, the label on the ladder specifies the weight limit, which means that any component on the ladder must withstand that limit. *See Davis v. United States*, 302 F. Supp. 3d 951, 959–60 (S.D. Ohio 2017) ("The Court's greater concern lies with Plaintiff's argument that [the expert] provided 'how' and 'why' he reached his conclusions by virtue of the fact that he has extensive personal experience on the subject."). Without explanation, Kelly's use of ladders does not mean that his opinion on whether certain components can withstand weight limits is reliable. *See Neal v. Fort*, No. 3:15-CV-0425, 2017 WL 455499, at *4 (M.D. Tenn. Jan. 20, 2017) ("Furthermore, the [r]eport contains no explanation of how [the expert's] experience informed his conclusions. Without such an explanation, there is simply too great an analytical gap between the facts of the case and the proffered opinion to permit [the expert's] testimony to go to the jury. While an expert's experience may be the basis for reliable testimony, it is not sufficient for an expert merely to recite his experience without further explanation.").

### B. Kelly's Opinion That a Manufacturing Defect Caused the Incident

Defendant challenges Kelly's qualifications to render his opinion that a manufacturing defect in the light bulb's assembly caused the incident. Plaintiffs assert that Kelly is a licensed professional engineer and that he "has experience as a facilities manager, charged with managing millions of square feet of commercial and industrial space, including lighting performance and compliance, among other functions" [Doc. 50 p. 6 (citations omitted)].

Even so, his experience as a licensed professional engineer and facilities manager does not render him qualified to testify about a manufacturing defect in a fluorescent light bulb. *See Mayes v. Sig Sauer, Inc.*, No. 119CV00146GNSHBB, 2023 WL 2730264, at *4 (W.D. Ky. Mar. 30, 2023) ("Villani's lack of design and manufacturing experience renders him unqualified to offer opinions regarding alleged design and manufacturing defects. Villani's qualifications amount to experience in handling, assembling, and disassembling firearms, which are insufficient qualifications for him to testify about the alleged defects."), *amended*, No. 119CV00146GNSHBB, 2023 WL 3854266 (W.D. Ky. June 6, 2023); *Huffman v. Electrolux Home Prods., Inc.*, 129 F. Supp. 3d 529, 538 (N.D. Ohio 2015) ("Contrary to [the plaintiff's] argument, the cases do not support the position that, simply because [the expert witness] is an experienced engineer, he is qualified to testify in a case with an engineering component."); *Newell Rubbermaid, Inc. v. Raymond Corp.*, No. 5:08-CV-2632, 2010 WL 2643417, at *4 (N.D. Ohio July 1, 2010) (finding that "although trained in engineering, [the expert] does not have specific qualifications to be identified as an expert" on design defects in the forklift), *aff'd*, 676 F.3d 521 (6th Cir. 2012); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.").

Kelly acknowledged at the *Daubert* hearing, and during his deposition, that his only familiarity with the manufacturing process of a fluorescent light bulb comes from watching a video years before this litigation [*See* Doc. 41-3 p. 13]. He also testified that he has never designed a fluorescent light bulb, he has never manufactured a fluorescent light bulb, and he has never published any literature about the proper manufacturing of a fluorescent light bulb. The Court finds that Plaintiffs have not met their burden in establishing that Kelly is qualified to render his opinion that a manufacturing defect caused the incident. *See Rolen v. Hansen Beverage Co.*, 193 F. App'x 468, 474 (6th Cir. 2006) (affirming the district court's decision to exclude the plaintiffs' expert, noting that "by his own admission [the expert] knew nothing about [the product], including how or with what it was made").

But even if Kelly were qualified to offer an opinion on a design defect of the subject light bulb, the Court finds that his methodology is unreliable and is not based on sufficient facts and data. *See* Fed. R. Evid. 702.[5] The Court finds the Sixth Circuit Court of Appeals' decision in *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000), instructive. In that case, the plaintiff sued defendants under the Tennessee Product Liability Act, "claiming that [a] disposable lighter that her husband was carrying exploded and caused him to sustain fatal burns." *Id*. at 569. The plaintiff disclosed a mechanical engineer, who opined on the manufacturing and design defects of the

---

[5] Defendant also asserts that Kelly's opinion is not helpful to the jury and therefore irrelevant because he cannot state "what defect existed in the lamp[,]" which it contends is necessary under Tennessee law [Doc. 42 p. 7; Doc. 51 p. 4]. Defendant also asserts that his opinions are speculative [*See id*. at 7–8]. The Court will address Defendant's challenges in the context of whether Kelly's opinions are reliable. *Abbott v. Mega Trucking, LLC*, No. 2:20-CV-776-WKW, 2023 WL 2640203, at *5 (M.D. Ala. Mar. 24, 2023) (concluding that the expert's methodology was not reliable, which "it follows that [his] expert testimony of fault and causation would not be helpful to the jury").

lighter, and two other experts to support the mechanical engineer's opinions. *Id*. at 570, 572. The Court affirmed the district court's decision to exclude the expert witnesses from testifying at trial, reasoning that they failed to conduct reliable laboratory testing to support the hypothesis that a manufacturing defect caused the explosion of a lighter. *Id*. at 578. The Court also reasoned that the mechanical engineer's opinion was contradicted by the plaintiff's other expert witness, "and by laboratory tests conducted by [the] defense['s] expert[,]" and "by the remains of the lighter itself." *Id*. The Court concluded, "The failure of [the plaintiff's] experts to test their hypotheses in a timely and reliable manner or to validate their hypotheses by reference to generally accepted scientific principles as applied to the facts of this case renders their testimony on the cause and origin of the fire unreliable and therefore inadmissible under *Daubert* and Federal Rules of Evidence 702 and 104." *Id*.

Here, Kelly explained that in order to arrive at his conclusions, he read Plaintiff Greene's deposition transcript, discussed the incident with him, and ruled out other causes. Plaintiffs argue that "Kelly's elimination of other causes is a legitimate investigative tool" and that he is not required to eliminate the possibility of other causes" [Doc. 50 p. 11]. But like the experts in *Pride*, once Kelly arrived at his hypothesis, he did not take steps to validate it. *See id*. at 572 ("However, he did not do any testing in preparation for his testimony in this case; he simply opined that, based on the reports, depositions, pictures and other records he reviewed, the fire started in the upper left-hand pocket of Mr. Pride's tee shirt and, because other potential sources had been ruled out, was probably caused by the lighter."). Kelly testified that he had three exemplars, but he did not perform any testing on these exemplars, including any residual testing, despite testifying in his deposition that he used the scientific method, which requires testing of a hypothesis [Doc. 41-3 p. 4]. *See Coffey*, 187 F. Supp. 2d at 977 (excluding expert testimony for failure to test similar

20

exemplar products because the "[p]laintiffs' argument simply fails the straight face test: of course no two studs are alike, but that does not mean that failure to test can be excused by the inherent variations that are likely to result from the testing of different objects"). And he attempted to find literature to support his hypothesis, but he was unsuccessful.

In sum, Kelly's methodology was neither reliable nor based on sufficient facts, and the Court finds his opinion that the light bulb had a manufacturing inadmissible.

## C.    Kelly's Opinion That Defendant Failed to Warn

Kelly submits in his July 3 Declaration that Defendant provided inadequate warnings [Doc. 41-8 ¶¶ 12–14]. Defendant argues that "Kelly is not a warnings expert" and that he is unfamiliar with the "intricacies of [the] Sylvania lamps" [Doc. 42 p. 18]. Plaintiffs contend that Kelly is "familiar with OSHA and [has] experience as a facilities manager" and that "he recognizes that the warnings on the labels do not address the acknowledged reaction of a fluorescent bulb imploding and forcibly expelling glass" [Doc. 50 p. 11]. This experience, according to Plaintiffs, "will assist the trier of fact in what an ordinary user of the product in the commercial setting would expect from the data sheets that are produced to warn users of the same" [*Id.*].

The Court finds that Plaintiffs have not established that Kelly is qualified to render an opinion regarding on warnings. While Kelly does not need to be "an expert in the underlying product[,]" he must be "an expert in a field relevant to the warnings themselves (e.g., human factors)[.]" *Romans v. Ford Motor Co.*, No. 2:16-CV-68, 2018 WL 2970741, at *8 (S.D. Ohio Mar. 16, 2018) (citations omitted). There is nothing in his curriculum vitae "to suggest that he has any experience in the adequacy of warnings" [Doc. 51 p. 10 (citing Doc. 50-1 pp. 30–40)]. Plaintiffs contend that Kelly's experience renders him an expert in this field. But Kelly's

21

experience is limited to reading various warning labels on products that he uses, which does not qualify him as an expert in the adequacy of warnings. *See Wise v. C.R. Bard, Inc.*, No. 2:12-CV-01378, 2015 WL 521202, at *14 (S.D. W.Va. Feb. 7, 2015) ("Dr. Raybon has no demonstrated experience in the requirements for product labeling, and as such, he may not testify as to what the Avaulta label should or should not have included under the law."); *In re Yamaha Motor Corp. Rhino ATV Prod. Liab. Litig.*, 816 F. Supp. 2d 442, 450 (W.D. Ky. 2011) (finding that the expert "lacks sufficient qualifications to discuss warning labels[,]" reasoning that the expert's curriculum vita does not "suggest[] he has any personal experience in this area; he never describes any relevant experience in his report, and [the defendant] never mentions such experience in its brief"); *cf. Lackey v. Robert Bosch Tool Corp.*, No. CV 16-29-ART, 2017 WL 129891, at *3 (E.D. Ky. Jan. 12, 2017) ("Because he has written safety warnings, evaluated many more, and served for years on committees that govern the warnings that should accompany table saws, it is safe to say that [the expert] has the knowledge necessary to testify regarding the SkilSaw's warnings.").

The Court therefore finds Kelly is not qualified to render an opinion on warnings and therefore finds this opinion inadmissible.[6]

### D. Kelly's Opinion About the Cleanup Process

Defendant's reply brief seeks to exclude Kelly's opinion that "[i]t was appropriate to clean the scene due to concerns about bloodborne pathogens and the COVID-19 pandemic resulting in the subject lamp being unavailable for testing" [Doc. 51 p. 10–11 (quoting Doc. 40 p. 7)]. This opinion, according to Defendant was not disclosed until the filing of Plaintiffs' response in opposition to its Motion to Exclude, and it argues that he is not qualified to render this opinion.

---

[6] The Court excludes this opinion under Rule 37 as well [*See infra* Section VI.C.].

In his July 3 Declaration, Kelly states, "Due to the concerns of bloodborne pathogens and the ensuing pandemic at the time of the incident the debris was disposed of as part of the cleanup process and was therefore not available for further evaluation . . ." [Doc. 41-8 ¶ 10]. Kelly testified at the hearing that he has attended multiple medical bloodborne pathogens training sessions, including sessions on how to respond, and he has been on medical emergency response teams. While Kelly may be qualified to discuss the cleanup process, he does not provide a factual foundation for his opinion that the debris here was cleaned up due to concerns of bloodborne pathogens and the pandemic. Given that Kelly has not provided any facts to support this statement, the Court finds it speculative and therefore inadmissible.

## VI.     MOTION TO STRIKE

Rule 26(a)(2) of the Federal Rules of Civil Procedure governs expert disclosures, which provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2). "[I]f the witness is one retained or specially employed to provide expert testimony in the case[,]" then the expert "disclosure must be accompanied by a written report—prepared and signed by the witness[.]" Fed. R. Civ. P. 26(a)(2)(B). Plaintiffs' expert disclosures were due 150 days before trial, or May 26, 2023 [Doc. 16 p. 3]. In addition, the Scheduling Order permits the parties to disclose expert rebuttal opinions "thirty (30) days after the disclosure made by the other party" [Doc. 16 p. 3; *see also* Doc. 31 (extending Plaintiffs' rebuttal disclosure deadline to July 26, 2023)].

Rule 26(a)(2)(D)(ii) states that rebuttal evidence is "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)[.]" Fed. R. Civ. P. 26(a)(2)(D)(ii). But this definition "merely begs the question of what 'real' rebuttal

evidence is. The answer to that question is not clear cut." *Taylor v. Brandon*, No. 3:14-cv-0588-DJH, 2018 WL 3581142, at *2 (W.D. Ky. Jan. 30, 2018). According to the Sixth Circuit, "[r]ebuttal testimony is responsive to new information by the other party." *In re Air Crash Disaster*, 86 F.3d 498, 528 (6th Cir. 1996). And a "rebuttal expert may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert." *Bentley v. Highlands Hosp. Corp.*, No. CV 15-97-ART-EBA, 2016 WL 5867496, at *5 (E.D. Ky. Oct. 6, 2016) (quoting *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013)). "But they may not 'advance new arguments or new evidence' outside the scope of the opposing expert's testimony." *Id.* (quoting *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 17 (D.D.C. 2013)).

Defendant challenges four opinions in Kelly's Declaration: "(1) certain black marks on the wall are as likely to be from other sources from the ladder [Plaintiff] Greene was using, (2) a plastic piece on the floor does not match the missing portion of an electrical outlet cover, (3) certain NFPA guidelines do not apply to this case, and (4) [Defendant] failed to warn that if broken, a fluorescent lamp can implode, dispersing glass fragments" [Doc. 46 p. 1]. Plaintiffs assert these opinions are proper rebuttal opinions and therefore timely disclosed under the Scheduling Order. Except for his opinion regarding Defendant's failure to warn, the Court declines to strike the opinions contained in Kelly's Declaration. The Court finds that Kelly's opinion regarding Defendant's failure to warn is untimely under the Scheduling Order and therefore, the undersigned excludes this opinion under Rule 37. [7]

---

[7] Defendant also relies on the Court's inherent authority to impose sanctions, which requires a finding of bad faith. *Meirs v. Ottawa Cnty.*, No. 1:15-CV-866, 2017 WL 11447054, at *3 (W.D. Mich. Dec. 15, 2017) ("Plaintiff is correct that bad faith is generally required for exercise

### A.    Opinion Nos. 1 and 2

Defendant argues that Kelly seeks "to add pieces of information to his analysis that he could have considered when he formed his opinions but did not" [Doc. 46 p. 7]. Plaintiffs submit that Kelly offered these opinions in response to Defendant's expert, Dr. Knox, and therefore, they are proper rebuttal opinions.

In his initial disclosure, Kelly states that "[Plaintiff] Greene positioned a ladder adjacent to the subject fixture" [Doc. 34-1 p. 4]. Dr. Knox opines, "More importantly, a ladder positioned to the right of the light fixture as testified to by [Plaintiff] Greene is inconsistent with the physical evidence of the transfer marks at the scene" [Doc. 39-3 p. 33]. Dr. Knox also opines Plaintiff Greene's account is inconsistent with "the evidence of broken pieces of the outlet cover seen in immediate post-incident photographs [*Id.* (citation omitted)]. In his Declaration, Kelly states that "[t]he marks on the wall are likely to be from parts or tools leaned up against the walls as from the ladder striking the wall close to the floor" [Doc. 34-4 ¶ 7]. He further opines that that the broken pieces on the floor do not match the broken cover plate [*Id.* ¶ 8(c)]. This opinion leads him to the conclusion that Plaintiff Greene's version of the incident is correct [*Id.* ¶ 8(d)].

The Court finds that Kelly's opinions on these topics are proper rebuttal testimony to Dr. Knox's opinions, and it declines to strike them. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii).

### B.    Opinion No. 3

Kelly states, "While the lay description of the event was termed an explosion, the circumstances of the lamp failure do not fit the definition within the [National Fire Protection Association] 921 Standard" [Doc. 34-3 ¶ 11]. Defendant argues that this statement constitutes "an

---

of the Court's inherent powers to sanction litigants." (citations omitted)). There is no evidence that Plaintiffs acted in bad faith.

effort to change his prior deposition testimony" [Doc. 46 p. 4]. Plaintiffs state that Defendant's motion for summary judgment relies on information that was unavailable to them, including Defendant's "explanation of how a bulb responds when it breaks" [Doc. 39 p. 3]. Following Kelly's deposition, Plaintiffs state that he "need[ed] to review and render opinions regarding the facts raised at his deposition which would underpin arguments of the Defendant's experts[,]" including the "argument that he did not use NFPA standards in rendering his opinion" [*Id.* at 4].

Kelly's initial disclosure does not mention NFPA 921 [*See* Doc. 34-1]. During his deposition, he stated that he applied elements of NFPA 921 to investigate [Doc. 46-2 p. 2]. He also explained during his deposition that he was not using the technical definition of an "explosion" pursuant to NFPA 921 [Doc. 34-2 pp. 9–10]. And after Kelly authored his initial disclosure, Powell referenced the NFPA definition of an "explosion" pursuant to the NFPA and noted that if a light bulb breaks, it can implode, which may appear as an explosion [Doc. 39-3 pp. 19, 22]. Powell also stated that Kelly "concede[d] that the incident at issue did not involve an explosion as that term is technically defined by the fire and explosion investigation community" [*Id.* at 21 (citation omitted)].

The Court finds that Kelly's opinion in his Declaration that the circumstances do not meet the definition of NFPA 921 is not an attempt to change his deposition testimony, and therefore, the Court declines to strike it.

### C.     Opinion No. 4

Kelly opines that the SDSs do not warn that a fluorescent light bulb can implode and forcibly disperse and therefore "[Plaintiff] Greene would not have been made aware of the severity of the hazard associated with the failed subject lamp[.]" [Doc. 34-3 ¶¶ 12–14]. He

concludes, "Given the lack of warnings in the SDS and the absence of warnings on the lamp, [Defendant] failed to provide adequate warnings for this product" [*Id.* ¶ 14].

Defendant argues that this opinion presents "a new theory of liability—inadequate warnings" [Doc. 46 p. 4 (citation omitted)]. Further, Kelly's opinion, according to Defendant, "does not contradict or rebut any opinions contained within either of Defendant's expert reports" [*Id.* (citation omitted)]. Plaintiffs respond that "[a]t the time of Mr. Kelly's disclosure, he did know that Defendant would argue that it could not warn of an 'impossible event[.]" [Doc. 39 p. 2 (citation omitted)].[8] And according to Plaintiffs, Powell explained, after Kelly wrote his initial disclosure, that if a light bulb fractures, it can implode.

Regardless of whether Kelly's opinion presents a new theory of liability, the Court finds that is not a proper rebuttal opinion. Defendant's experts do not issue an opinion on warnings [*see* Docs. 39-2 and 39-3], which Kelly acknowledged at the *Daubert* hearing. Because Plaintiffs allege failure to warn in the Amended Complaint [*see* Doc. 26 ¶ 6], and Kelly disclosed in his initial disclosure that the light bulb exploded, Plaintiffs should have disclosed an opinion from an expert with the requisite qualifications regarding warnings in their initial disclosures. *Taylor*, 2018 WL 3581142, at *2 ("Put differently, if the evidence or opinion offered in rebuttal is evidence or an opinion that the Plaintiff ordinarily would be expected to offer in support of one or more of the elements of its cause of action, then such evidence or opinion is not 'real' rebuttal evidence and may properly be excluded on such ground by the district court."). Instead, they disclosed Kelly's new opinions that he is not qualified to render. The Court therefore finds that

---

[8]    Relying on Powell's opinion that the fluorescent light bulb cannot explode, Defendant moved for summary judgment on Plaintiffs' failure to warn claim [*see* Doc. 26 ¶ 6], arguing that "[i]t makes little sense for a company to provide a warning that an impossible event might happen" [Doc. 28 p. 15].

Kelly's opinion that Defendant failed to provide adequate warnings is untimely under the Scheduling Order.

"If a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The burden to show substantial justification or harmlessness is on the potentially sanctioned party. *Roberts*, 325 F.3d at 782.

The Sixth Circuit has identified five factors to consider when assessing whether a party's omitted or late disclosure is "substantially justified" or "harmless":

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 747–48 (6th Cir. 2015) (quoting *Russell v. Abs. Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)).[9] "District courts have broad discretion in applying these factors and need not apply each one rigidly. The factors simply lend themselves to the task at the heart of Rule 37(c)(1): separating 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019) (quoting *Bentley*, 2016 WL 5867496, at *10).

---

[9] As the Sixth Circuit Court of Appeals has noted, "The advisory committee's note to Rule 37(c) 'strongly suggests that "harmless" involves an honest mistake on the party of a party coupled with sufficient knowledge on the part of the other party.'" *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003) (quoting *Vance v. United States*, No. 98–5488, 1999 WL 455435, at *5 (6th Cir. June 25, 1999) (unpublished table decision)); *see also* Fed. R. Civ. P. 37(c)(1) advisory committee's note (1993) (giving as an example of a harmless violation the "inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties").

28

The Court finds that a majority of the factors weigh in favor of exclusion. Plaintiffs assert that Defendant cannot be surprised because Kelly's original report stated that he may supplement with additional opinions [*See* Doc. 34-1 p. 3]. Even so, this assertion does not allow an expert to render new opinions in violation of the Scheduling Order. *Cf. Bentley*, 2016 WL 5867496, at *4 ("But the window for supplementation and rebuttal does not stay open forever. And it is not hard to see why—otherwise 'there would be no finality to expert reports, as each side, in order to buttress its case" would go on ad infinitum "'supplementing' existing reports and modify[ing] opinions previously given.'" (quoting *Beller ex rel. Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003)). And Defendant does not have the ability to cure the surprise. While Plaintiffs' offer to provide Kelly for a second deposition helps to alleviate the surprise [*see* Doc. 39 p. 7], Defendant represents that it would "potentially retain its own warnings expert, educate that expert on the case, and ask that expert to prepare a rebuttal report" [Doc. 35 p. 6]. While there will not be any disruption of the trial [*see* Doc. 35 p. 7], the deadline for discovery expired on July 26, 2023 [*See* Doc. 24]. *See Bentley*, 2016 WL 5867496, at *10 (finding that the defendant could not cure the surprise because "the deadline for the defendants to respond to these expert disclosures had either come and gone . . . or was soon to expire"). The Court also finds that the importance of the evidence favors exclusion because Kelly is not qualified under Rule 702 and *Daubert* to render this opinion, *see supra* pp. 21–23. Finally, with respect to their explanation, Plaintiffs assert that Kelly's opinion constitutes a rebuttal opinion. The Court has determined that it is not. Pointing to Powell's declaration [Doc. 27-2], they argue that they were not aware Defendant intended to submit evidence showing that a glass tube can disperse forcibly such that a layperson would believe it had exploded. But Plaintiffs allege failure to warn in their Amended Complaint

[*see* Doc. 26 ¶ 6], and Kelly referenced in his initial disclosure "an explosive-type force" [Doc. 34-1].

After weighing the *Howe* factors, the Court finds that they weigh in favor of excluding Kelly's opinions regarding warnings.[10]

## VI.    CONCLUSION

For the reasons explained above, the Court **GRANTS** Defendant's Motion to Exclude Testimony of Plaintiff's Expert Witness, Thomas Kelly [**Doc. 41**] and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Strike the Declaration of Thomas J. Kelly, P.E. [**Doc. 34**].

**IT IS SO ORDERED.**

ENTER:

_Jill E. McCook_
Jill E. McCook
United States Magistrate Judge

---

[10]    Defendant seeks its attorney's fees pursuant to Rule 37(c)(1)(A), which provides that the Court may award reasonable expenses, including attorney's fees, if a party fails to provide information as required by Rule 26(a). Fed. R. Civ. P. 37(c)(1)(A). An award of attorney's fees may be made "[i]n addition to or instead of [exclusion]." Fed. R. Civ. P. 37(c)(1). Given the nature of the relief afforded, the Court declines to award Defendant its attorney's fees. *See Coleman v. Cardinal Health 200, LLC*, No. 12-CV-11154, 2013 WL 3990676, at *4 (E.D. Mich. Aug. 2, 2013) (noting that the court's authority to award fees is discretionary and not mandatory).